JORDAN v. STATE.

4464                                              205 S. W. 2d 469

Opinion delivered November 17, 1947.

*Guy E. Williams,* Attorney General, and *Oscar E. Ellis,* Assistant Attorney General, for appellee.

HOLT, J. Appellant, Selmer Jordan, was charged by information with murder in the first degree, alleged to have been committed by shooting George W. Renfro to death. The trial jury found him guilty of voluntary manslaughter and assessed his punishment at two years imprisonment in the penitentiary. This appeal followed.

Appellant has not filed a brief.

In his motion for a new trial, he alleged that (1) the evidence was not sufficient to support the verdict, (2) the court erred in giving each of the instructions 1 to 23, inclusive, on behalf of the State over his objection and exceptions, (3) in refusing his requested instruction No. 1, and (4) "in permitting the prosecuting attorney in his closing argument to argue to the jury over the objections and exceptions of the defendant that it was the defendant's duty to exhume and perform an autopsy on the deceased's, George Renfro's, body to determine the manner in which deceased was shot."

## (1)

Appellant admitted the killing, but testified that he did so in his own self-defense.

Ethel Renfro, widow of the deceased, testified that she was present when her husband was shot and killed. "I went out on the porch for something. I heard some talking down in the field, it was Selmer (appellant) talking to George (the deceased)." She could see them both and was about 220 steps away. "The first I heard was Selmer cursing George and saying that he ought to kill George and that he would kill him. Jordan (appellant) told him to get out and to get away from there and not to come back. He (George) said, I am going." She further testified that appellant and her husband argued over payment for some firewood and rent claimed by Bertha Davis, who was present, and that Bertha called George "a low-down liar and Selmer shot him. . . . . I was watching Selmer. I don't know which way George was facing. Q. Why were you watching Selmer? A. He was cursing George and said that he ought to kill him and he would. Q. Did you see the gun? A. No, sir, but I saw the smoke when he fired."

Following the shooting she asked appellant to help her and to stay with her husband until she could get help, but that he refused and a little later appellant, in company with Mrs. Davis, left the scene carrying the double barrel shotgun. She further testified, in effect, that her husband was unarmed and "Did Selmer tell you down

there that he killed him (George Renfro)? A. Yes, sir."
There was also other evidence that George Renfro was
unarmed.

Henry Morse testified that "Selmer said that he
killed George or had to kill him or something like that."
Shortly thereafter appellant left carrying the double
barrel shotgun.

There was evidence that the deceased was shot in the
back.

Appellant testified that he was 70 years of age and
had lived at Mulberry, Arkansas, all of his life. His ver-
sion was that he and deceased quarreled about appel-
lant's right to remove certain cane as appellant's part
of rent from land claimed by deceased and when he told
the deceased that he was "going to haul it out," that
deceased said: "You might go ahead and strip that, but,
by God, you won't haul it out, he said that there would
be guns popping all over this place." They had also had
other misunderstandings and quarrels.

.He further testified: "On Thursday, I don't know
why I did it, but I did. I came in from the west up
through the woods. I didn't come in from the north
where I did on Wednesday. It led into this opening north
of the crossing there. When we got there, I walked
through this gap that had been cut across this branch and
I had walked here through the gap and turned to the
left toward the cane and set my jug of water down and
I carried my gun with me, and I sat down on the rock and
still held to the barrel. Just about that time the dogs
made a racket barking at something. I just stopped just
about there and I saw Mr. Renfro get up from the thicket
that was right straight across from where I had laid the
paddle down and he came through this gap to the north
of the cane and came right around through this gap.
. . . He came around like he was in a hurry, he was
looking out in the cane, but I was just up behind these
honeysuckle vines, he was looking out there in the cane.
All of a sudden he looked around and saw me 14 feet or
7 or 8 steps away. He whirled right around to the right.

I was on the east. He threw that gun on me, I seen that gun in his hand and before he had time to shoot me, I shot him. . . . Q. What happened when you shot him? A. He fell from me. When the charge of shot hit him, he fell down. Q. Fell on his back or face? A. It sorta knocked him. He staggered down, he didn't fall. Once he got right up and staggered and fell again, then got about half up again and fell and never did get up any more."

There was other testimony, but we do not attempt to set it out in detail. It thus appears, viewing the testimony in the light most favorable to the State, as we must, it tended to show that appellant shot appellee in the back, killing him almost instantly and at a time when the deceased was unarmed and about eight steps away, when appellant was in little, if no danger of being injured by the deceased. We think the testimony, when all was considered, was ample to support the jury's verdict and in fact would have supported a higher degree of homicide than that of which appellant was found guilty. *Clardy* v. *State,* 96 Ark. 52, 131 S. W. 46; *Brown* v. *State,* 208 Ark. 180, 185 S. W. 2d 274, and cases there cited.

### (2)

The court's instructions were those usually given in a case of this nature and were correct declarations of law applicable to the facts presented. They correctly and clearly defined murder in the first degree, murder in the second degree and voluntary manslaughter and in fact every phase of the case appears to have been fully and properly presented to the jury. Instructions similar in effect have been many times approved by this court. We find no prejudicial error in any of them.

### (3)

The court was also correct in refusing to give appellant's requested instruction No. 1, since this instruction had been fully covered by other instructions given by the court. The court was not required to repeat instructions.

(4)

Appellant's last complaint that the court erred in permitting improper argument of the prosecuting attorney, is without merit for the reason that the record fails to show that the argument complained of was made, objected to and exceptions saved. Therefore, this alleged error is not before this court for consideration.

On the whole case, finding no error, the judgment is affirmed.